UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 17-12191

RYAN N. SCEVIOUR,

    Plaintiff,

  v.

COLONEL RICHARD M. MCKEON,
MAJOR SUSAN ANDERSON, THE
MASSACHUSETTS STATE POLICE,
AND A NUMBER OF JOHN DOES
AND/OR JANE DOES,

    Defendants.

## **COMPLAINT**

*Introduction*

    This case arises out of a civil conspiracy to violate State Trooper Ryan Sceviour's constitutional rights. The defendants, along with other co-conspirators referred to herein as John and/or Jane Does, interfered and attempted to interfere – through threats, intimidation, and coercion – with the plaintiff's property interest in his employment. Specifically, in an effort to unlawfully alter a police report and illegally tamper with Court documents, the defendants and their co-conspirators agreed to discipline the plaintiff for following the law, adhering to the ethical standards governing his conduct as a trooper, and for resisting the defendants' orders that he act with improper and illegal purpose.

    The plaintiff hereby alleges as follows:

*Jurisdiction & Venue*

1. Jurisdiction is proper pursuant to 28 U.S. Code § 1331, as the plaintiff alleges claims herein pursuant to 42 U.S. Code § 1983.

2. This Court has jurisdiction over the plaintiff's pendant state claims pursuant to 28 U.S. Code § 1367.

3. Venue is proper in the District of Massachusetts, as the Commonwealth of Massachusetts employs all parties, and all conduct relevant to the plaintiff's claims occurred within the borders of the Commonwealth.

*The Parties*

4. The plaintiff, Ryan N. Sceviour ("Trooper Sceviour"), at all times relevant hereto, has been employed by the Massachusetts State Police as a Massachusetts State Police Trooper.

5. The defendant, Colonel Richard D. McKeon ("Colonel McKeon"), is the Superintendent of the Massachusetts State Police.

6. The defendant, Major Susan Anderson ("Major Anderson"), at all times relevant hereto, has been employed as a Major by the Massachusetts State Police.

7. The defendant, the Massachusetts State Police ("MSP"), is an agency of the Commonwealth of Massachusetts established pursuant M.G.L. c. 22C, Section 2, with a principal place of business located in Middlesex County at 470 Worcester Road, Framingham.

8. Upon information and belief, John and Jane Does are officers of the Massachusetts State Police, members of the Worcester District Attorneys' Office, and others.

*Facts*

9. Ryan Sceviour is 29 years old and is currently employed as a trooper for the Massachusetts State Police.

10. Prior to joining the MSP, Trooper Sceviour was employed by the Towns of Brewster and Canton as a Police Officer.

11. Trooper Sceviour entered the State Police Training Academy in October of 2015 and graduated in April of 2016.

12. Massachusetts State Troopers receive training regarding the writing of police reports.

13. Troopers are trained to include all extraordinary statements made by criminal defendants when writing a report after an arrest for "Operating a Motor Vehicle While Under the Influence".

14. Massachusetts Rule of Criminal Procedure 14 mandates that the Commonwealth provide the criminal defense with "the substance of any oral statements made by the defendant".

15. Trooper Sceviour has prepared hundreds of reports regarding various incidents and arrests during his law enforcement career. He was never disciplined in any manner relating to his reports until October 19, 2017.

2

16. Trooper Sceviour was assigned to the Holden State Police barracks in July of 2016.

17. On Monday, October 16, 2017, he was working the 3PM to 11PM shift.

18. At approximately 1935 hours, Trooper Sceviour responded to a call regarding an automobile crash on Interstate 190 South.

19. Upon arrival, he observed a 2000 Toyota Corolla with heavy frontend damage.

20. The driver, a female, was outside of the vehicle. A male passenger indicated that the female had been operating the car.

21. Trooper Sceviour noted that the female emanated a strong odor of alcohol and showed multiple other symptoms of being under the influence, including that she was making unusual statements.

22. The driver indicated that her name was Alli Bibaud. Trooper Sceviour did not note anything significant regarding her last name.

23. Trooper Sceviour conducted a number of field sobriety tests with Ms. Bibaud. She failed each one of them.

24. Ms. Bibaud indicated that she was sick and was a heroin addict. Trooper Sceviour placed her under arrest.

25. A female Trooper who is a Drug Recognition Expert, Trooper Ali Rei ("Trooper Rei"), arrived on the scene. The vehicle was searched and Sceviour discovered a yellow handbag containing syringes, a metal spoon, and corner cut plastic bags. This paraphernalia was consistent with intravenous heroin use.

26. Trooper Rei placed Ms. Bibaud in the rear of Sceviour's cruiser.

27. Trooper Sceviour transported Ms. Bibaud to the State Police barracks in Holden, Massachusetts. During the transport, Ms. Bibaud was screaming and crying.

28. At one point, Ms. Bibaud stated that her father was a judge. Trooper Sceviour questioned the truth of the statement.

29. Ms. Bibaud was booked in Holden. At the barracks, she consented to take a breathalyzer. Two tests were performed, which produced results of .224 and .222, respectively.

30. During the breath test, Ms. Bibaud made multiple inappropriate statements suggesting that she would offer sexual favors in return for leniency.

31. While at the barracks, Ms. Bibaud also agreed to take part in testing for narcotics with Trooper Rei.

32. During the testing, Trooper Rei asked Ms. Bibaud how she obtained the heroin. Ms. Bibaud responded by indicating that she had performed sexual acts in order to pay for the drugs.

33. The question as to how a suspect obtained drugs is a standard part of the protocol for drug recognition testing.

34. Trooper Rei entered information regarding her observations of, and statements made by, Ms. Bibaud into the Administrative Log.

35. Ms. Bibaud was charged with Operating Under the Influence of Narcotics; Operating Under the Influence of Liquor; Negligent Operation of a Motor Vehicle; Marked Lanes Violation; and Failure to Inspect.

36. After processing, Ms. Bibaud was released on personal recognizance.

37. During the early morning of October 17, 2017, Trooper Sceviour prepared an arrest report on the computer.

38. Trooper Rei entered the information regarding her observations of Bibaud in the Administrative log.

39. Pursuant to procedure, Trooper Sceviour's immediate supervisor, Sergeant Jason Conant ("Sergeant Conant"), determined that the contents of the report were appropriate and approved it.

40. Sergeant Conant's approval was noted on the document.

41. Trooper Sceviour printed out the report, signed it, and made copies so that the State Police Court Officer could deliver it to Court.

42. The Court Officer delivered the report, along with other relevant documents, to the Worcester District Court on the morning of October 17, 2017.

43. Trooper Sceviour heard nothing further about Ms. Bibaud's arrest on either October 17th or October 18th.

44. Trooper Sceviour worked the 3PM to 11PM shift on October 17th.

45. He had October 18th and 19th as scheduled days off.

46. Trooper Sceviour was woken abruptly at around 10 AM on October 19, 2017 by a loud banging on the door of his house.

47. When he answered, a fellow state trooper greeted him.

48. The Trooper told him that he was to report to the Holden barracks immediately.

49. Thereafter, Trooper Sceviour retrieved two voicemails that had been left on his phone by Lieutenant James Fogarty ("Lt. Fogarty"), his supervisor at the Holden barracks.

50. The first voicemail indicated that Trooper Sceviour was to immediately report to the Holden barracks in response to a direct order from "the Colonel" (defendant, Colonel McKeon) regarding the arrest of "a judge's daughter".

51. In the second voicemail, Lt. Fogarty told Trooper Sceviour to call him as soon as he received the voicemail because it was "extremely important".

52. Trooper Sceviour drove over 90 miles from his home to the Holden barracks.

53. Upon arrival, Trooper Sceviour was met by Sergeant Conant and his union representative, Trooper Jeffrey Gilbert ("Trooper Gilbert").

54. Trooper Sceviour, Sergeant Conant, and Trooper Gilbert met with Lt. Fogarty.

55. Lt. Fogarty informed them that he had been ordered by his supervisor, Major Anderson, to issue Sergeant Conant and Trooper Sceviour negative "Supervisory Observation Reports" in order to reprimand them for including certain statements made by Ms. Bibaud in the arrest report.

56. The written reprimand indicated that Trooper Sceviour was being disciplined for "the negative and derogatory statements included within the gist of your report."

57. Sergeant Conant was reprimanded for "approving this report and allowing inappropriate commentary to be included in the report."

58. Lt. Fogarty told Trooper Sceviour that he had done nothing wrong and that he (Fogarty) would have included the statements if he had prepared the report.

59. Lt. Fogarty also stated that Sergeant Conant had done nothing wrong, but since Major Anderson had ordered Lt. Fogarty to issue the negative Observation Reports, "he was forced to do so".

60. Lt. Fogarty indicated that he did not agree that the negative Observation Reports were warranted.

5

61. Lt. Fogarty and Sergeant Conant then left the barracks and Troopers Sceviour and Gilbert met with Major Anderson.

62. During this meeting, Trooper Sceviour asked Major Anderson why she had ordered that he receive a negative Observation Report. She replied that she was also of the opinion that Trooper Sceviour had done nothing wrong but that "it was ordered by the Colonel".

63. Major Anderson also stated that she did not know why "they were doing this" to Trooper Sceviour.

64. During the meeting, Major Anderson told Trooper Sceviour that he was to edit the report. She produced a copy of Trooper Sceviour's report, on which hand written notes were visible in two different ink colors.

65. Major Anderson indicated that edits proposed by her supervisor, Lieutenant Colonel Daniel Risteen ("Lt. Colonel Risteen"), were in red ink and edits proposed by her were in black ink.

66. Trooper Gilbert asked Major Anderson if he could have a copy of the marked up report, but she refused to give it to him and stated that he could take notes but could not have a copy of the actual document with the handwriting on it.

67. Trooper Sceviour told Major Anderson that he did not want to make the edits and that he believed doing so was "morally vacant".

68. Trooper Gilbert told Major Anderson that he believed that the order to alter the report was wrong and that he did not agree with it.

69. Trooper Gilbert indicated to Major Anderson that Trooper Sceviour would only make the revisions if he were directly ordered to do so.

70. Major Anderson responded, "this is an order Jeff, we all have bosses". She indicated that the order had come from "Bennett" (referring to Secretary of Public Safety Daniel Bennet) to Colonel McKeon to Lt. Colonel Risteen to her.

71. Trooper Sceviour opposed making the edits and deletions, and asked Trooper Gilbert what would happen if he refused to do so.

72. Trooper Gilbert informed him that he would be charged with insubordination and, consequently, would be subject to discharge if he refused to obey Major Anderson's order.

73. Trooper Sceviour again opposed, stating, "If this was some random person and not a judge's kid, none of this would be happening".

6

74. Major Anderson agreed with Trooper Sceviour but gave him a direct order to make the revisions anyway, in an effort to eliminate certain relevant and incriminating statements made by Ms. Bibaud from the report.

75. As a result of the illegal coercion by his supervisors, Trooper Sceviour was forced to alter his report.

76. Trooper Sceviour told Major Anderson that he wanted to note in his report that he had revised it because of an order by his supervisors.

77. Major Anderson responded that he was not permitted to do so.

78. Upon information and belief, Major Anderson and others wanted the altered report produced in such a way that if it was surreptitiously placed in the Court file, there would be no indication that it had replaced the original report.

79. Trooper Sceviour told Major Anderson that he would not revise the report unless he could note on it that it was not the original.

80. After some discussion, Major Anderson allowed Trooper Sceviour to indicate in the report that it was "Revised on October 19, 2017".

81. Major Anderson also told Troopers Sceviour and Gilbert that she had been ordered to remove Trooper Rei's notes regarding her observations of Ms. Bibaud from the daily administrative journal of the State Police.

82. Major Anderson took out paper pages from the administrative journal which contained Trooper Rei's observation, and shredded them.

83. After Trooper Sceviour reluctantly complied with Major Anderson's order, she ordered him to deliver the altered report to Worcester Assistant District Attorney Jeffrey Travers ("ADA Travers") and to Ms. Bibaud's defense counsel, Kara Colby ("Attorney Colby").

84. Subsequently, Major Anderson changed her mind, telling Trooper Sceviour that she would deliver the altered report to Attorney Colby herself, and that Trooper Sceviour should deliver it to ADA Travers.

85. Trooper Sceviour then traveled to the Worcester District Court and delivered the report to ADA Travers, who appeared to be expecting him.

86. Court records indicate that the amended report is not currently in the Court file.

87. On October 17, 2017, Attorney Colby filed a handwritten motion asking the Court to impound Trooper Sceviour's report on the grounds of "prejudicial pre-trial publicity". The Motion was granted.

7

88. The next court appearance was scheduled for October 30, 2017.

89. A day after the altered report with the marking "Revised on October 19, 2017" was delivered to ADA Travers, the Commonwealth brought the matter forward, at which time ADA Travers made an oral motion to redact the original, impounded report. The Motion was allowed.

90. The redactions made in the original report are similar to the items that Trooper Sceviour was ordered to remove from his report.

*The Conspiracy*

91. Sometime prior to 9:15 AM on October 19, 2017, Colonel McKeon, Major Anderson, and others entered into an agreement to coerce Trooper Sceviour to produce an altered report regarding the arrest of Ms. Bibaud, which would appear to be the original report.

92. Colonel McKeon, Major Anderson and others agreed to arrange to have the original report surreptitiously removed from the Court file and to replace it with the altered report.

93. However, Trooper Sceviour refused to produce a new report unless he could note on it that it was revised.

94. Sometime after Trooper Sceviour delivered the altered report to the ADA, the conspirators realized that the plan would not be successful, likely because of Trooper Sceviour's courageous stand.

95. As a result of Trooper Sceviour's actions, the conspirators were not able to execute their plan and the altered report was never put in the Court file.

96. On October 26, 2017, a website published a report indicating that District Attorney Joseph Early had contacted Colonel McKeon and arranged to have the report altered.

97. As a result of the publication, Colonel McKeon ordered the State Police media spokesperson to make false and derogatory statements to the media regarding Trooper Sceviour, particularly that his report included improper statements that violated the standards for report-writing and that required removal.

98. The actions of Colonel McKeon, Major Anderson, and others have caused the plaintiff damage to his reputation, have negatively impacted his employment, and have caused him severe emotional distress.

99. On October 16, 2017, Trooper Sceviour was doing his job in protecting and serving the citizens of the Commonwealth when he arrested Ms. Bibaud.

100. The arrest report written by Trooper Sceviour was consistent with his duties and complied with the highest standards of the State Police and the ethical responsibilities entrusted to him by the citizens of the Commonwealth.

101. The actions of the defendants, and others to be named, in attempting to alter court records and in damaging Trooper Sceviour's career and reputation are both shocking and outrageous.

COUNT I
*Violation of Federal Constitutional Rights*
*Pursuant to 42 U.S.C. Section 1983*
*v.*
*All Defendants*

102. The plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

103. The plaintiff enjoys a right to his employment free from interference aimed at achieving unlawful and unethical ends, threats of suspension without pay, intimidation, and coercion into aiding in unlawful and unethical acts, and without discipline for following the rule of law and opposing the defendants' attempts to violate it.

104. The defendants violated the plaintiff's constitutional rights by inhibiting him from following the law, by interfering with him performing the duties of his job within lawful and ethical bounds, and by disciplining him and subjecting him to adverse action for illegal, conspiratorial purposes.

105. As a result of the defendants' unconstitutional and unlawful conduct, the plaintiff was reprimanded, threatened with suspension without pay, intimidated, and coerced into committing acts to which he objected because those acts were illegal and unethical.

106. The plaintiff was disciplined, and suffered damage to his job security, his reputation, and severe emotional distress, as a result of the defendants' outrageous conduct.

WHEREFORE, the plaintiff asks that this Court order that his discipline be expunged, that the defendants issue an apology, and for compensatory and punitive damages, his costs, attorneys' fees, and all other relief to which he is entitled by law.

COUNT II
*Violation of State Constitutional Rights*
*Constitution of the Commonwealth, Chapter 12, Section 11H*
*v.*
*All Defendants*

107. The plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

108. The plaintiff enjoys a right to his employment free from interference aimed at achieving unlawful and unethical ends, threats of suspension without pay, intimidation, and coercion into aiding in unlawful and unethical acts, and without discipline for following the rule of law and opposing the defendants' attempts to violate it.

109. The defendants violated the plaintiff's constitutional rights by inhibiting him from following the law by means of threats, intimidation, and coercion, by interfering with him performing the duties of his job within lawful and ethical bounds by means of threats, intimidation, and coercion, and by disciplining him and subjecting him to adverse action for illegal, conspiratorial purposes by means of threats, intimidation, and coercion.

110. As a result of the defendants' unconstitutional and unlawful conduct, the plaintiff was reprimanded, threatened with suspension without pay, intimidated, and coerced into committing acts to which he objected because those acts were illegal and unethical.

111. The plaintiff was disciplined, and suffered damage to his job security, his reputation, and severe emotional distress, as a result of the defendants' outrageous conduct.

   WHEREFORE, the plaintiff asks that this Court order that his discipline be expunged, that the defendants issue an apology, and for compensatory and punitive damages, his costs, attorneys' fees, and all other relief to which he is entitled by law.

COUNT III
*Civil Conspiracy*
*State and Federal*
*v.*
*All Defendants*

112. The plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

113. The agreement between the defendants, when each was knowingly acting for illegal purposes, and threatened, intimidated, and coerced the plaintiff in order to accomplish unlawful ends, and then disciplined and disparaged him for it, constitutes a conspiracy.

114. Each of the defendants, knowing that their conduct was illegal, unethical, and unconstitutional, acted in concert for improper and illegal purposes, and assisted and encouraged one another, in violating the plaintiff's rights and then disciplining him for opposing, and for having followed the rule of law.

115. As a result of the defendants' unconstitutional and unlawful conspiracy, the plaintiff was reprimanded and was threatened, intimidated, and coerced into committing acts to which he objected because those acts were illegal and unethical.

116. The plaintiff was disciplined, and suffered damage to his job security, his reputation, and severe emotional distress, as a result of the defendants' outrageous conduct.

WHEREFORE, the plaintiff asks that this Court order that his discipline be expunged, that the defendants issue an apology, and for compensatory and punitive damages, his costs, attorneys' fees, and all other relief to which he is entitled by law.

## COUNT IV
*Intentional Infliction of Emotional Distress*
*v.*
*All Defendants*

117. The plaintiff repeats and re-allege the preceding paragraphs as if fully set forth herein.

118. The defendants intended to inflict emotional distress on the plaintiff and should have known that their conduct would inflict emotional distress on the plaintiff.

119. The defendants' conduct was extreme and outrageous, beyond all bounds of decency and utterly intolerable in a civilized community.

120. The distress suffered by the plaintiffs was severe and of the nature that no reasonable person could be expected to endure it.

121. As a result of the defendants' unconstitutional and unlawful conduct, the plaintiff was reprimanded and was threatened, intimidated, and coerced into committing acts to which he objected because those acts were illegal and unethical.

122. The plaintiff was disciplined, and suffered damage to his job security, his reputation, and severe emotional distress, as a result of the defendants' outrageous conduct.

WHEREFORE, the plaintiff asks that this Court order that his discipline be expunged, that the defendants issue an apology, and for compensatory and punitive damages, his costs, attorneys' fees, and all other relief to which he is entitled by law.

## COUNT V
*Violation of the Massachusetts Whistleblower Statute, M.G.L. c. 149, Section 185*

*v.*
*The Massachusetts State Police*

123. The plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

124. The plaintiff followed the law, and objected to participating in a practice of the defendants that was, and that the plaintiff reasonably believed, posed a risk to public safety.

125. As a result, the defendants took disciplinary action and other adverse action against the plaintiff, and threatened him with suspension for insubordination if he did not comply with their illegal and improper orders.

126. The plaintiff was disciplined, and suffered damage to his job security, his reputation, and severe emotional distress, as a result of the defendants' outrageous conduct.

WHEREFORE, the plaintiff asks that this Court order that his discipline be expunged, that the defendants issue an apology, and for compensatory and punitive damages, his costs, attorneys' fees, and all other relief to which he is entitled by law.

### COUNT VI
*Defamation*
*v.*
*The Massachusetts State Police*

127. The plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

128. The MSP – through its spokesperson – knowingly made false and defamatory statements to the media about the plaintiff and relating to the plaintiff's character.

129. The statements were published on October 26, 2017 by Worcester Magazine.

130. The statements falsely accuse the plaintiff of wrongdoing and were made in order to cover up the defendants' conspiratorial and illegal conduct.

131. As a result, the plaintiff suffered damage to his reputation and severe emotional distress.

WHEREFORE, the plaintiff asks that this Court order that his discipline be expunged, that the defendants issue an apology, and for compensatory and punitive damages, his costs, attorneys' fees, and all other relief to which he is entitled by law.

## JURY DEMAND

The Plaintiff Demands a Trial by Jury on all Claims so Triable.

        Respectfully submitted,
        The Plaintiff,
        Trooper Ryan Sceviour,
        By his attorneys,

        */s/ Leon H. Kesten*
        Leon H. Kesten, BBO# 542042
        Michael Stefanilo, Jr. BBO# 684500
        BRODY, HARDOON, PERKINS & KESTEN, LLP
        699 Boylston Street
        Boston, MA 02116
        (617) 880-7100
        lkesten@bhpklaw.com
        mstefanilo@bhpklaw.com

Dated: November 7, 2017